**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF 115 COLLEGE STREET, APT 3, LEWISTON, MAINE AND THE PERSON OF DASHANE SEAMSTER | Case No. 2:25-mj-00161-KFW **Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Adam Morin, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises for 115 College Street, Apartment 3, Lewiston, Maine hereinafter referred to as "PREMISES" further described in Attachment A, for the things described in Attachment A, for the things described in Attachment B.

2. As described in further detail below and in Attachment A, the government is seeking evidence inside and outside of the PREMISES known to be occupied by DASHANE SEAMSTER and the person of SEAMSTER. The items to be seized by the government are described in further detail below and in Attachment B.

3. I have been employed as a Special Agent (SA) with the Federal Bureau of Investigation ("FBI"), since May 2017, and am I currently assigned to work in the Portland, Maine Resident Agency. I previously served as a Patrol Officer with the Portland, Maine Police Department from 2013 until 2017. Over the course of my law enforcement career, I have participated in numerous drug trafficking investigations,

pursuant to which I have utilized various investigative tools and techniques, including search warrants.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other members of law enforcement and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

5.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841, 843, and 846 (drug trafficking, unlawful use of a communications facility, and conspiracy to commit drug trafficking) have been committed, are being committed, and will be committed at the PREMISES by SEAMSTER and other unknown subjects in the District of Maine. There also is probable cause to believe that SEAMSTER has used, is using, and will continue to use the cellular telephones in furtherance of these drug-related crimes. Accordingly, there is probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

6.      The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court a District Court of the United States that has jurisdiction over the offenses being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

**PROBABLE CAUSE**

7.      Members of law enforcement, led by the FBI, are conducting an ongoing covert criminal investigation into the drug trafficking activities of Target Subject DASHANE SEAMSTER (hereinafter SEAMSTER) and his associates. In about January

2

2025, an FBI Confidential Human Source[1] ("CHS") provided FBI with information that SEAMSTER was trafficking cocaine, cocaine base, fentanyl, fentanyl pressed pills, and methamphetamine.

8.      I know from my participation in this investigation that during February 2025, law enforcement directed CHS to communicate with SEAMSTER to arrange a controlled purchase of pressed fentanyl pills and fentanyl. According to CHS, a controlled purchase for 5 sticks (i.e., 50 grams) of fentanyl and 600 pressed fentanyl pills in exchange for $4000 was arranged with SEAMSTER using Snapchat (these communications were memorialized). CHS stated that SEAMSTER solely communicated with CHS by Snapchat text and video/voice calls. CHS provided SEAMSTER's Snapchat account username as "savioso87."[2] SEAMSTER told CHS to meet him at his residence to purchase the drugs, which CHS knew to be the PREMISES.

9.      On about February 4, 2025, law enforcement met with CHS and equipped CHS with electronic recording and transmitting devices and provided CHS with $4000 of pre-recorded U.S. currency. Law enforcement established physical surveillance in the area of the PREMISES. CHS then drove to and parked outside of the PREMISES and

---

[1]      CHS is financially motivated to cooperate with the government. CHS has not yet been financially compensated at this time. CHS has a criminal history to include Unlawful Possession of Scheduled Drugs, Disorderly Conduct, Negotiating a Worthless Instrument, Theft by Deception, and Violating Conditions of Release. CHS's information has been corroborated by, among other things, electronic and physical surveillance and has been deemed reliable.

[2]      On about February 6, 2025, the FBI submitted a preservation request and subpoena for subscriber information to Snapchat. The subpoena return yielded the following information of note: Phone number-207-344-8445, email-dashaneseamster@gmail.com.

placed a call to a SEAMSTER. SEAMSTER told CHS to come into the PREMISES and provided the keypad code to enter the building. CHS then entered the apartment and met with SEAMSTER. CHS paid SEAMSTER $4000 and was provided with approximately 600 pressed fentanyl pills and approximately 50 grams of fentanyl. CHS then left the residence and drove to a predetermined meet location while being followed by other members of law enforcement.

10.    Upon arrival at the predetermined meet location, CHS provided officers with two clear plastic bags that each were tied in a knot. One bag contained a brown powdery substance, and the other contained hundreds of small blue pills. CHS also turned over approximately 100 loose small blue pills. The CHS stated that SEAMSTER first provided CHS 500 pills in a clear plastic bag, SEAMSTER told the CHS that he had to obtain the 500 pills from his source of supply. CHS stated that SEAMSTER then had to go into another room and get more pills out of his "own supply" to fill CHS's order; SEAMSTER handed CHS these pills with no container. Subsequent review of the CHS recording showed that CHS's recollection of the controlled purchase was accurate.

11.    The evidence was then processed by members of the FBI Task Force, including field testing of the suspected drugs. A TruNarc scan performed on the bag containing the brown powder yielded a presumptive positive result for fentanyl; the total packaging weight was 76.65 grams. A TruNarc scan was attempted on the small blue pills, during that process two pills were crushed to obtain a testing quantity, the TruNarc scan yielded an inconclusive finding; the total packaging weight was 89.85 grams. Subsequently, both the brown powder and the blue pills were provided to a DEA drug laboratory for further analysis. The lab confirmed that both substances had a

detectable amount of fentanyl. The laboratory report noted that the net weight of the brown powder was 49.55 grams and the net weight of small blue pills was 64.03 grams.

12. The day following the controlled purchase described above, on about February 5, 2025, South Portland Police were dispatched to the Maine Mall in response to reports of a shooting. I also responded, and was informed that the shooter fled the mall on foot after the incident. I reviewed a surveillance photo of the shooter and participated in a canvas search of the surrounding area, but the shooter was not located at that time.

13. During my subsequent investigation, I learned that the victim of the shooting was SEAMSTER and that he was shot in the bathroom by the food court of the mall. A female who identified herself as SEAMSTER's girlfriend was interviewed by investigators, and stated that she was standing outside of the bathroom during the incident, and that SEAMSTER and the shooter had been in a dispute over money. She further stated that she witnessed SEAMSTER crawling out of the bathroom to the hallway as the shooter followed, and then pointed a gun at SEAMSTER while stating, in substance, that SEAMSTER was lucky he had not been killed. South Portland Police Department released surveillance images of the shooter to the media on about the evening of February 5, 2025. Ultimately their investigation identified the shooter as Target Subject AHMED AWAD.

14. I learned from investigators that SEAMSTER was transported to Maine Medical Center with a gunshot wound to the leg and that he was initially uncooperative with South Portland officers who attempted to interview him.

15. On about February 6, 2025, AWAD voluntarily surrendered at the Cumberland County Jail. He was arrested and charged with a number of state offenses

stemming from the shooting incident described above. During intake, a black iPhone was recovered from AWAD's sock. South Portland Police seized the cell phone which was seized by the FBI on February 17, 2025. The phone is currently secured in temporary storage in FBI custody.

16.     On February 17, 2025, FBI met with South Portland Police at their Police Department and took custody of SEAMSTER's cellphone and entered it into FBI evidence.

17.     I have reviewed a South Portland Police report concerning the investigation of AWAD, from which I learned that SEAMSTER eventually informed South Portland Police that he communicated with the AWAD on Snapchat after he provided multiple inconsistent statements. I also learned that South Portland Police collected two expended 9mm casings and one unfired 9mm bullet at the scene of the shooting.

18.     On February 14, 2025, United States Magistrate Judge Karen Frink Wolf, issued search warrants for SEAMSTER's Snapchat account (2:25-mj-00061-KFW) as well as for the two cellphones seized from AWAD and SEAMSTER's possession (2:25-mj-00065-KFW). During a subsequent review of the content extracted from SEAMSTER's cellphone, a chat was located between Snapchat users "savioso87" (believed to be SEAMSTER as described above) and "boogieosama"[3] (believed to be AWAD as detailed below). The chat took place on December 8, 2024. After a Snapchat video/voice call took place between both users, SEAMSTER sent AWAD a chat message

---

[3]     On about March 4, 2025, the FBI submitted a preservation request and subpoena for subscriber information to Snapchat.

"115 college". I believe SEAMSTER to be referring to the PREMISES. AWAD then indicated he was on his way. While reading further through the chat, I recognized the dialog between the two users to be drug trafficking related. SEAMSTER messaged AWAD, "7 a piece" followed by "I don't even sell them all like that". AWAD then replied, "I thought we just said 200 erks for 400". SEAMSTER replied, "7 dollars a piece". AWAD then replied, "at least do 3" and engaged in several calls through Snapchat with SEAMSTER. I know based on my training and experience that "erks" is a slang term used to refer to the narcotic Percocet.

19.     During a review of the content extracted from AWAD's phone, Snapchat content was discovered. The username affiliated with the Snapchat account on Awad's phone was "boogieosma".

20.     During March 2025, law enforcement directed CHS to communicate with SEAMSTER to arrange a controlled purchase of 500 pressed fentanyl pills and 60 grams fentanyl.

21.     On about March 4, 2025, at FBI's direction CHS conducted a second controlled buy with SEAMSTER. CHS was equipped with electronic recording and transmitting devices and provided with $4000 of pre-recorded U.S. currency. Law enforcement established physical surveillance in the area of the PREMISES. CHS then drove to the PREMISES, parked and walked into SEAMSTER's apartment and met with SEAMSTER. CHS was informed by SEAMSTER that he misunderstood CHS's order and that he thought that CHS wanted 6 grams of fentanyl, although CHS had sought to purchase 60 grams of fentanyl. SEAMSTER provided CHS with 6 grams of fentanyl and approximately 512 small blue pills and then asked CHS to leave the apartment and wait approximately 30 minutes until he was ready with the rest of CHS's order. The CHS

then departed the property and drove back to the pre-determined meeting location while being followed by members of law enforcement. The CHS provided FBI with one clear plastic bag that contained a brown powder and a clear plastic bag that contained hundreds of small blue pills. After approximately 30 minutes CHS returned to the PREMISES while being followed by members of law enforcement and met with SEAMSTER in the apartment. CHS then left the PREMISES and drove to a predetermined meet location while being followed by other members of law enforcement.

22.    Upon arrival at the predetermined meet location, CHS provided officers with a clear plastic bag that contained a brown powder. The CHS stated that in total across the two trips to the PREMISES, SEAMSTER provided CHS 512 small blue pills and 60 grams of fentanyl for $4000. Subsequent review of the CHS recording showed that CHS's recollection of the controlled purchase was accurate.

23.    The evidence was then processed by members of the FBI Task Force, including field testing of the suspected drugs and subsequent testing by a DEA drug lab. The DEA laboratory confirmed that the brown powder and the blue pills both had a detectable amount of fentanyl. The laboratory report noted that the net weight of the brown powder was 60.27 grams and the net weight of small blue pills was 55.446 grams.

24.    During April 2025, law enforcement directed CHS to communicate with SEAMSTER to continue purchasing narcotics from SEAMSTER. Specifically, the FBI requested that the CHS attempt to purchase methamphetamine and fentanyl.

25.    On about April 1, 2025, law enforcement met with CHS and equipped CHS with electronic recording and transmitting devices and provided CHS with $4900 of pre-recorded U.S. currency. The CHS arranged to purchase approximately 4 ounces of

methamphetamine and 120 grams of fentanyl from SEAMSTER. Law enforcement established physical surveillance in the area of the PREMISES. CHS then drove to the PREMISES, parked and called SEAMSTER. CHS was informed by SEAMSTER that he was not ready and to come back later. The CHS then departed the property and drove back to the pre-determined meeting location while being followed by members of law enforcement. Approximately 67 minutes later, law enforcement officers performing physical surveillance on the PREMISES, identified SEAMSTER walk out of the PREMISES with a dog and walk over to the front porch and then inside of 113 College Street, next door to the PREMISES. Surveilling officers noted that SEAMSTER was walking with a limp. CHS returned to the area and parked on the street outside of the PREMISES. Law enforcement officers observed SEAMSTER walk from the rear of 113 College to the CHS vehicle and enter the vehicle's front passenger seat. After approximately one minute SEAMSTER exited the CHS vehicle and walked behind 113 College Street. The CHS then departed and was followed by members of law enforcement to a predetermined meet location.

26.    Upon arrival at the predetermined meet location, CHS provided officers with a clear plastic bag that contained a brown powder and a heat-sealed bag that contained a clear crystal substance. The CHS stated that in total SEAMSTER provided CHS 4 ounces of methamphetamine and 120 grams of fentanyl for $4900. CHS stated that SEAMSTER was wearing a white "jump suit." Subsequent review of the CHS recording showed that CHS's recollection of the controlled purchase was accurate.

27.    The evidence was then processed by members of the FBI Task Force, including field testing of the suspected drugs followed by analysis by a DEA drug laboratory. The DEA laboratory confirmed that the brown powder contained heroin and

9

a detectable amount of fentanyl; the net weight was noted as 119.5 grams. The clear crystal substance was confirmed as methamphetamine; the net weight was noted as 111.34 grams.

28.     On about April 15, 2025, law enforcement met with CHS and equipped CHS with electronic recording and transmitting devices and provided CHS with $4500 of pre-recorded U.S. currency. CHS arranged to purchase approximately 2 ounces of methamphetamine and 160 grams of fentanyl from SEAMSTER. Law enforcement established physical surveillance in the area of the PREMISES. CHS then drove to the PREMISES and parked. Law enforcement officers observed a black male wearing a blue hooded sweatshirt and gray pants walk from the driveway of 113 College Street to CHS's vehicle. Officers noted that the male had a limp when he walked. CHS then exited the vehicle and walked into the PREMISES with the black male. After approximately one minute CHS and the black male exited the PREMISES. The black male walked towards 113 College Street. CHS then departed the property and drove back to the pre-determined meeting location while being followed by members of law enforcement.

29.     Upon arrival at the predetermined meet location, CHS provided officers with a clear plastic bag that contained a brown powder and a clear plastic bag that contained a clear crystal substance. CHS was debriefed, and recalled that SEAMSTER told CHS that he was up the road and that CHS should drive to the PREMISES. When CHS parked, SEAMSTER met CHS outside and walked with CHS into the PREMISES to do the deal. CHS stated that in total SEAMSTER provided CHS 2 ounces of

10

methamphetamine and 160 grams of fentanyl for $4500. Subsequent review of the CHS recording showed that CHS's recollection of the controlled purchase was accurate.

30. The evidence was then processed by members of the FBI Task Force, including field testing of the suspected drugs. A TruNarc scan performed on one the bags containing the brown powder yielded a presumptive positive for heroin with fentanyl compound or methamphetamine; the total packaging weight was 185.70 grams. The heat-sealed bag containing a clear crystal substance yielded a presumptive positive for methamphetamine finding when tested by the TruNarc instrument; the total packaging weight was 81.70 grams. Both drug items are pending submission to the DEA laboratory for conclusive testing.

31. A query performed by Lewiston Police in their database showed that SEAMSTER's address was listed as the PREMISES.

32. I debriefed CHS specifically about the entry to the PREMISES. CHS stated, in substance, that to access the PREMISES door, one would walk up the stairs located on the right side of the building to the third floor. When one is at the third floor hallway the PREMISES door is located approximately 3 steps down the hallway and located on the left-hand side. CHS stated that the PREMISES is the only apartment in the hallway. CHS also stated that there is a storage area directly across from the PREMISES door on the right side of the hallway. CHS stated that the there is only one stairwell to access the hallway.

## TECHNICAL TERMS

33. Based on my training and experience, I use the following technical terms to convey the following meanings:

11

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen

12

for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that

13

antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

34.  Based on my training, experience, and research, I believe that the electronic devices have capabilities that allow them to serve as wireless telephones, digital cameras, portable media players, GPS navigation devices, and PDAs. In my training and experience, examining data stored on devices of this type can uncover,

14

among other things, evidence that reveals or suggests who possessed or used the devices.

**COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS**

35.    As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media, including cellular telephones. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

36.    *Probable cause.* I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, including cellular telephones, for at least the following reasons:

    a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not

15

currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

   c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

   d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

37.   *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files and information that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store

16

Case 2:25-mj-00161-KFW    Document 1-1    Filed 04/29/25    Page 17 of 22    PageID #: 69

configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was

17

accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password

protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

38. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on

19

storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it

20

difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

39. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

40. Because several people may share the PREMISES, it is possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

21

## CONCLUSION

41.     Based on the forgoing, I request that the Court issue the proposed search warrant.

Respectfully submitted,

Adam Morin
Special Agent
Federal Bureau of Investigation

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedures

Date:  Apr 29 2025

City and state:  Portland, Maine

_Judge's signature_

Karen Frink Wolf,  U.S. Magistrate Judge
_Printed name and title_